UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

ALEXANDRIA DIVISION

STRIC...
...N DISTRICT OF LOUI...
RECEIVED

DEC 3 0 2015

TONY R. MOORE, CLERK

b

JAMES VEAL,                    CIVIL ACTION
        Plaintiff             SECTION "P"
                               NO. 1:13-CV-00566
VERSUS

STEPHEN KUPLESKY, et al.,      JUDGE JAMES T. TRIMBLE, JR.
        Defendants            MAGISTRATE JUDGE JOSEPH H.L. PEREZ-
                               MONTES


REPORT AND RECOMMENDATION OF MAGISTRATE JUDGE

Before the Court is a civil rights complaint filed pursuant to 42 U.S.C. § 1983, in forma pauperis, by pro se prisoner James Veal ("Veal") on February 19, 2015 (Doc. 1) and amended on July 25, 2013 (Doc. 14), August 7, 2013 (Doc. 15), and October 25, 2013 (Doc. 20).  The named defendants are Stephan Kuplesky (a medical doctor employed at the Winn Correctional Center ("WCC") in Winnfield, Louisiana), Timothy Keith ("Keith")(warden of WCC), Mark Daniel (medical director of WCC), Corrections Corporation of America ("CCA") (former operator of WCC), Nicole Walker (an assistant warden at WCC), Amy Brunson ("Brunson")(a nurse employed at WCC), and Barbara Spense (a nurse employed at WCC).[1]  Veal, a diabetic,

---

[1]
    Veal voluntarily dismissed his action against Warden Keith (Docs. 9, 10).
    Daniel Marr was misnamed by Veal as "Marr Daniel" in his complaint (See Docs. 20, 60).
    Veal misspelled Nurse Barbara Spence's name as "Nurse Spenes."

contends that, since 2011, he has been denied medical care for his serious medical needs in WCC, e.g., surgery for ingrown toenails, calluses and bunions, medical care for a torn ligament in his knee, and medical care for his eye problems (Docs. 1, 14).  Veal contends that Dr. Kuplesky told him he could not have the recommended treatments or surgeries due to budget constraints (Doc. 1).  Veal seeks a declaratory judgment, compensatory and punitive damages, injunctive relief, costs, legal interest, and a jury trial.

Defendants answered the complaints (Docs. 23, 25, 57) and filed a motion for summary judgment with documentary evidence (Docs. 37, 57, 75, 79), to which Veal responded (Docs. 79, 80, 82), and Defendants replied (Doc. 81).  Defendants' motion is now before the Court for disposition.

<u>Medical Records</u>

In January 2010, Veal was evaluated at the LSU Health Sciences Center and diagnosed with diabetes with peripheral neuropathy, calluses, and onychomycosis,[2] and his calluses were debrided (Doc.

---

Finally, although Nurse Gaskill, Nurse Mary, and Nurse Warren were named in one of Veal's amended complaints (Doc. 14), they were not included in his last amended complaint (Doc. 20), Veal did not request service on them, and they were never served.  Therefore, the complaint against these Defendants should be dismissed without prejudice pursuant to Fed.R.Civ.P. 4(m).  <u>See</u> <u>McGinnis v. Shalala</u>, 2 F.3d 548, 550 (5th Cir. 1993), cert. den., 510 U.S. 1191 (1994); <u>Systems Signs Supplies v. U.S. Dept. of Justice</u>, 903 F.2d 1011, 1013 (5th Cir. 1990); <u>Kersh v. Derosier</u>, 851 F.2d 1509, 1512 (5th Cir. 1988).

[2] Onychomycosis is "[f]ungal nail infection, [or] a fungus growing in and around your fingernail or toenail."  MEDLINEplus Health Information, Medical Encyclopedia: Onychomycosis,

34, p. 18/26).  Veal was noted to be wearing shoes that were too small due to his peripheral neuropathy and history of amputation (of a toe), so the doctor dispensed a pair of diabetic shoes to Veal, prescribed Neurontin, and referred him to outpatient physical therapy for custom molded orthotics (Doc. 1, Ex. p. 5/50; Doc. 34, p. 18/26).

In February 2010, Veal was re-evaluated at LSU Health Sciences Center and diagnosed with diabetes, onychomycosis and calluses on his feet, his nails and calluses were debrided, he was prescribed Elavil, Neurontin, and Carmol cream (for his feet), and he was referred to physical therapy with the notation that he had been referred many times before to physical therapy but had never been there (Doc. 1, Ex. p. 4/50; Doc. 39, Ex. p. 13/19).  On February 25, 2010, at the LSU Health Sciences Center, Veal was diagnosed with diabetes mellitus with neuropathy and a corn on his right fifth toe, the corn was excised, and Veal was prescribed a topical cream for his feet (Doc. 1, Ex. p. 3/50; Doc. 9, Ex. p. 31/37).

In June 2010, x-rays of Veal's right knee (due to joint pain) showed degenerative changes but no acute abnormality (Doc. 1, p. 7/50; Doc. 9, Ex. p. 33/37).  X-rays of Veal's right shoulder also showed degenerative changes but no acute bony abnormality (Doc. 1, Ex. p. 6/50; Doc. 34, Ex. p. 13/26).

---

*available at* http://www.nlm.nih.gov/medlineplus/encyclopedia.html
(a service of the U.S. National Library of Medicine and the National Institutes of Health).

3

On February 1, 2011, at WCC, Dr. Cleveland ordered that Veal's toenails be trimmed and found Veal had a very tender bunion on his left great toe (Doc. 1, Ex. pp. 10, 15/50).  On February 10, 2011, after a show-cause hearing on Veal's motion for a preliminary injunction, the District Judge in this case ordered Defendants to take Veal to either a podiatrist or an orthopedist within the next 30 days (Doc. 34, Ex. p. 16/26).  On February 17, 2011, Dr. Cleveland ordered that Veal be taken to the diabetic foot clinic, and appointment was made for February 28, 2011 (Doc. 1, pp. 9, 15/50).

On February 28, 2011, at the Huey P. Long Medical Center Outpatient Clinic, Veal's history of Hepatitis B and C, his insulin-dependent diabetes mellitus, and the previous amputation of the fifth toe on his left foot were noted (Doc. 1, Ex. p. 8/50). Veal was found to have severe hallex valgus (bunions) on his left foot due to diabetes, surgery on his left foot to correct the bunions was discussed, and it was recommended that Veal use diabetic footwear with insoles and LAC Hydrin lotion (Doc. 1, Ex. pp. 8, 11/50; Doc. 9, Ex. p. 29/37; Doc. 20, Ex. p. 5/18; Doc. 34, pp. 17/26; Doc. 37, Ex. p. 43/88; Doc. 38, Ex. p. 6/19). At WCC, Dr. Cleveland prescribed Veal the LAC Hydrin lotion to apply to his feet daily for six months (Doc. 1, Ex. pp. 8, 11/50).

On March 1, 2011, Dr. Cleveland continued Veal's LAC Hydrin lotion and, on March 4, he was given Duoderm by the foot clinic to

4

apply as needed (Doc. 1, Ex. p. 26/50).  On March 30, 2011, Veal was provided Keflex for two weeks, one pair of insoles, corn pads, antifungal cream, and Vaseline packs (Doc. 1, Ex. p. 15/50).  Veal complained that he needed to see a doctor rather than a nurse (Doc. 1, Ex. p. 16/50).

On March 30, 2011, Veal was examined by Nurse Warren, who noted Veal's complaint that he was not being seen by a doctor; Veal had a corn and calluses on each foot (Doc. 1, Ex. pp. 17-18/50). Veal's blood pressure was 128/89 and his blood sugar was 153 (Doc. 1, Ex. p. 18/50).  Nurse Warren consulted Dr. Cleveland, who ordered corn pads for Veal (Doc. 1, Ex. p. 18/50).

On April 4, 2011, Physician's Assistant Coleman examined Veal for complaints of pain in both feet, worse on the left, mostly around two calluses (Doc. 1, Ex. p. 19/50).  PT Walid clipped Veal's nails, noted he had pain with debridement of his calluses, and ordered Veal to go to the clinic for orthotics and, possibly, shoes (Doc. 1, Ex. p. 19/50).

On April 19, 2011, Veal's glucose was 334, and a physician at LSU Health Sciences Center ordered treatment with insulin (Doc. 1, Ex. p. 23/50).  Veal was also found to have a limited range of motion but no pain (Doc. 1, Ex. p. 23/50).  Veal admitted he was eating sugar and syrup in the prison and was ordered to decrease his sugar products, he was prescribed Improvon for hypertension, he was told to go to the foot clinic in August for his diabetic foot

follow-up, and he was referred to the orthopedic clinic for his right knee pain and laxity (Doc. 1, Ex. p. 25/50).

On April 26, 2011, Veal was prescribed Clonidine, Prilosec, new tennis shoes, and his Humulin (insulin) was increased to 70 units in the morning and 63 units in the evening (Doc. 1, Ex. p. 26/50).  Veal was prescribed Cetaphil lotion on April 28, 2011 (Doc. 1, Ex. pp. 23, 26/50).

On June 15, 2011, Veal's Humulin was increased to 75 units in the morning and 65 units in the evening (Doc. 1, Ex. p. 26/50).  On June 17, 2011, Veal was prescribed Tolnaftate cream for his foot fungus (Doc. 1, Ex. p. 27/50).  On June 20, 2011, the WCC medical department requested a consultation with Snell's for custom orthotics for Veal (Doc. 1, Ex. pp. 28-29/50).

According to a response (dated January 15, 2013) to one of Veal's grievances, Veal received his orthopedic shoes on August 8, 2011, returned to LSU for evaluation of his foot problems on August 15, 2011 and no active issues were noted, and he was seen in the LSU surgery clinic on February 13, 2012 for a discussion of potential complications from diabetes (Doc. 9, Ex. p. 35/37; Doc. 20, pp. 17/18).

On July 16, 2012, Veal had a diabetic eye exam at the LSU Health Sciences Center; Veal complained of blurry vision, photophobia, and burning in both eyes intermittently (Doc. 37, Ex. p. 3/88).  Veal admitted he had been smoking about two packs per

6

day (Doc. 37, Ex. p. 3/88). Veal was diagnosed with suspected glaucoma (his intraocular pressure was in the upper limits of normal), diabetes mellitus, and blepharitis; Veal was encouraged to control his blood sugar and instructed on cleaning his eyelids and using artificial tears (Doc. 37, Ex. pp. 3-4/88).

On August 10, 2012, at WCC, Veal was provided lotion but told he did not have an order for eye drops (Doc. 80, Ex. p. 10/17). In a response to a grievance, Veal was told that no prescription was sent back with him for artificial tears from his July 16, 2012 visit to the LSU Health Sciences Center (Doc. 80, Ex. p. 12/17).

In February 2013, Veal had an annual diabetic foot exam with Dr. Clint N. Lincoln at the LSU Health Sciences Center; Veal had a bunion and a corn on his left foot, fungal infections (onychomycosis) on all toes with ingrown toenails, most prominent on his left great toe, he admitted to smoking one pack of cigarettes per day, he had minimal joint swelling in his left great toe, and he had decreased sensation in both heels (Doc. 37, Ex. p. 50/88). Veal was diagnosed with "diabetic foot" and prescribed Gabapentin (brand name Neurontin) 600 mg. three times daily (Doc. 37, p. 50/88). In April 2013, Veal was prescribed Gabapentin for six months (Doc. 37, Ex. p. 14/88).

In May 2013, Veal was treated for blepharitis and dry eyes at the LSU Health Sciences Center and instructed to use warm compresses one or two times per day over both eyes, scrub the lids

7

with Ocusoft pads or baby shampoo three to four times per week, and use preservative-free artificial tears at least four times per day (Doc. 37, pp. 7-8, 12/88).  Veal received artificial tears and baby shampoo from June 2013 through October 2013 (Doc. 37, Ex. pp. 21-41/88).  Veal was also diagnosed with low risk open angle glaucoma with borderline findings (intraocular pressure at the upper limits of normal) and diabetes mellitus (Doc. 37, Ex. pp. 10-11).  At WCC, on May 15, 2013, Dr. Kuplesky ordered that Veal be given artificial tears and warm compresses for his eyes, and gave him a permanent duty status for indoor duty, a bottom bunk, permission to use a cane, and permission to wear slippers where allowed (Doc. 37, Ex. p. 14/88).

In June 2013, Veal complained of "excruciating pain" in his feet and knees, and asked to see a podiatrist and an orthopedist (Doc. 37, Ex. p. 54/88).  Veal's blood pressure was 145/91; his knee appeared to move out of joint; he had a large, raised callus on the bottom of his right foot; and his toenails appeared black, thickened, and long (Doc. 37, Ex. pp. 54-55).  Veal was instructed to rest (Doc. Ex. p. 37/55/88), and Dr. Kuplesky prescribed Amlodipine, ASA (aspirin), Loratadine, MVI, Clonidine, Gemfibrozil, Humulin, Metoprolol, Amitriptyline, Omeprazole, and Metformen (Doc. 37, Ex. p. 42/88).

On July 4, 2013, Dr. Kuplesky prescribed Neurontin 600 mg twice a day, Lubriderm, and Tolnaftate cream (Doc. 37, Ex. pp. 20,

52/88). On July 10, 2013, Veal asked that the eyelid scrub prescribed by LSU Health Sciences Center be ordered (Doc. 37, Ex. p. 16/88). Veal's eyes were noted to be yellow and dry, Dr. Kuplesky was consulted, and the lid scrub was ordered, to be used every day (Doc. 37, Ex. pp. 17, 20/88). Veal's feet were swollen and discolored, his left great toe was swollen, his toe nails were thick and discolored, he had calluses on both feet, and he complained of "burning feet" (Doc. 37, Ex. pp. 18-19/88). Veal was diagnosed with diabetic neuropathy, and his Neurontin prescription was continued at 600 mg in the morning and increased to 900 mg in the evening (Doc. 37, Ex. pp. 18-19/88). On July 29, 2013, Veal's prescriptions were continued and an appointment was scheduled at the LSU diabetes foot clinic (Doc. 37, Ex., p. 20/88).

On August 19, 2013, Veal was taken to LSU Health Sciences Center and refused to be examined (Doc. 37, Ex. p. 56/88).

In October 2013, Veal's blood pressure was 140/97, he weighed 250 pounds (he weighed 253 lb. in July 2013) (Doc. 37, Ex. pp. 67-/88). Veal was diagnosed with diabetes mellitus II, hypertension, and left chest wall pain, he was noted to be on an 1800 calorie diet, his insulin was increased, and he was told to stop smoking (Doc. 37, Ex. pp. 67-70/88).

On November 13, 2013, Veal was examined in the LSU Health Sciences Center and found to have elevated blood sugar with values generally less than 200, suspected early glaucoma, controlled

9

intraocular pressure, no retinopathy, and blepharitis (treated with lid scrubs, warm compresses, and artificial tears) (Doc. 37, Ex. pp. 61-65/88).

In January 2014, Veal was noted to be in the prison medical department waiting room, laughing (so hard that he was crying) at another inmate's jokes; Veal asked to be sent to Huey P. Long Medical Center, complained that there were no specialists at LSU Health Sciences Center, and stated that the courts would decide where he would go for medical care (Doc. 37, Ex. p. 57/88).

An eye exam in January 2014 again showed no diabetic retinopathy in Veal's eyes (Doc. 37, Ex. p. 66/88).

In March 2014, a nurse talked Veal into soaking his feet and cutting his overgrown toenails (Doc. 37, Ex. pp. 80-81).

On April 8, 2014, Veal was observed walking without his cane and he was ambulating with a steady and even gait when he left the medical department at WCC (Doc. 57, Ex. p. 4/19).

On April 10, 2014, Veal's blood pressure was 125/76, he weighed 244 pounds, his glucose was 157, and his triglycerides were up to 640 (Doc. 37, Ex. pp. 71-75/88). Veal's left upper eye lid was swollen and his feet were dry, so he was prescribed Lubriderm cream for his feet and warm, moist towel soaks for his left eye; Veal refused the artificial tears eye drops (Doc. 37, Ex. p. 78/88).

On June 3, 2014, Veal complained that his feet were numb and

burning (Doc. 57, Ex. p. 2/19).  It was noted that Veal had eaten
pancakes and cereal for breakfast, that his symptoms were not new,
he had been seen multiple times for the same symptoms, and he
continued to be noncompliant with the dietary modifications
necessary for glucose control (Doc. 57, Ex. p. 2/19).  Veal was
found to have bipedal edema, bunions on both feet, and his toenails
were thickened (Doc. 58, Ex. p. 2/19).  Veal was diagnosed with
poorly controlled diabetes mellitus secondary to noncompliance and
chronic leg pain secondary to his diabetes, and was instructed that
he must be complaint with his diet and medications (Doc. 57, Ex. p.
1/19).

On June 13, 2014, Veal refused a new pair of tennis shoes
(Doc. 57, Ex. p. 1/19).

In September 2014, Veal demanded toenail clippers and
antifungal cream for his feet, and stood outside of the medical
lobby door and smoked a cigarette (Doc. 57, Ex. p. 1/19).

In November 2014, Veal was found to be compliant with his
medications, and the doctor wrote an order for an "ortho telemed"
(Doc. 57, Ex. pp. 17-18/19).

In January 2015, Veal was seen in WCC for complaints that his
shoulders, back, legs, the tops of his feet, his knees, and his
shoulder blades were all burning (Doc. 57, p. 6/19).  Veal's blood
pressure was 137/90, he was ambulating with a straight cane, and
his gait was even (Doc. 57, pp. 6-7/19).  Veal asked for lotion but

would not take off his socks (Doc. 57, p. 7/19). Veal did not have diaphoresis (excessive perspiration), he was not grimacing or moaning, he easily went from sit to stand, and he ambulated slowly but with an even gait out of the medical department, using a straight cane (Doc. 57, Ex. p. 7/19). Veal was prescribed Tylenol (Doc. 57, Ex. p. 7/19).

Also in January 2015, Veal complained of burning pain in his ankles and his right knee (Doc. 57, Ex. p. 8/19). Veal's weight was 222 pounds and his blood pressure was 144/96 (Doc. 57, Ex. p. 9/19). X-rays of his ankles and knee were normal (Doc. 57, Ex. p. 9/19). However, an MRI of Veal's right knee showed degeneration with joint effusion, and he was diagnosed with osteoarthritis of the right knee with an associated degenerative meniscal tear (Doc. 57, Ex. p. 13/19).

<u>Law and Analysis</u>

<u>Summary Judgment</u>

Rule 56 of the Federal Rules of Civil Procedure mandates that the Court shall grant a summary judgment:

> if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

Paragraph (e) of Rule 56 also provides the following:

> If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may: (1) give an opportunity to properly support or address the fact; (2) consider the fact undisputed for purposes of the motion; (3) grant summary judgment if the motion and

supporting materials-including the facts considered undisputed-show that the movant is entitled to it; or (4) issue any other appropriate order.

Local Rule 56.2W (formerly 2.10W) also provides that all material facts set forth in a statement of undisputed facts submitted by the moving party will be deemed admitted for purposes of a motion for summary judgment unless the opposing party controverts those facts by filing a short and concise statement of material facts as to which that party contends there exists a genuine issue to be tried.

In this regard, the substantive law determines what facts are "material." A material fact issue exists if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. However, the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient to preclude summary judgment; there must be evidence on which the jury could reasonably find for the plaintiff. See Stewart v. Murphy, 174 F.3d 530, 533 (5th Cir. 1999), 528 U.S. 906, 120 S.Ct. 249 (1999), and cases cited therein.

If the movant produces evidence tending to show that there is no genuine issue of material fact, the nonmovant must then direct the Court's attention to evidence in the record sufficient to establish the existence of a genuine issue of material fact for trial. In this analysis, we review the facts and draw all inferences most favorable to the nonmovant. Herrera v. Millsap,

862 F.2d 1157, 1159 (5th Cir. 1989).   However, mere conclusory allegations are not competent summary judgment evidence, and such allegations are insufficient to defeat a motion for summary judgment.   Topalian v. Ehrman, 954 F.2d 1125, 1131 (5th Cir.), cert. den., 506 U.S. 825, 113 S.Ct. 82 (1992).

Eighth Amendment and the Denial of Medical Care

The Constitution does not mandate comfortable prisons, but neither does it permit inhumane ones, and it is now settled that the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment.   See Farmer v. Brennan, 511 U.S. 825, 832 (1994), and cases cited therein.   Although the Eighth Amendment does not, by its precise words, mandate a certain level of medical care for prisoners, the Supreme Court has interpreted it as imposing a duty on prison officials to ensure that inmates receive *adequate* medical care.   Easter v. Powell, 467 F.3d 459, 463 (5th Cir. 2006), citing Farmer, 511 U.S. at 832.   The fact that the medical care given is not the best that money can buy does not amount to deliberate indifference.   Mayweather v. Foti, 958 F .2d 91 (5th Cir. 1992); Ruiz v. Estelle, 679 F.2d 1115, 1149 (5th Cir.1982), amended in part and vacated in part on other grounds, 688 F.2d 266, 267 (5th Cir. 1982).

Under the Eighth Amendment, a lack of proper inmate medical care can be "cruel and unusual punishment" only if it is

14

"sufficiently harmful to evidence deliberate indifference to serious medical needs." Estelle v. Gamble, 429 U.S. 97, 106 (1976). First, the deprivation must be, objectively, sufficiently serious and the prison official's act or omission must result in the denial of the minimum civilized measure of life's necessities. Second, a prison official must have a sufficiently culpable state of mind, i.e. deliberate indifference to a prisoner's constitutional rights, to be subjected to § 1983 liability to that prisoner. Farmer, 511 U.S. at 834. The Supreme Court defined "deliberate indifference" as "subjective recklessness", or, in other words, a conscious disregard of a substantial risk of serious harm. Farmer, 511 U.S. at 839.

Because an inadvertent failure to provide adequate medical treatment does not violate the Eighth Amendment, deliberate indifference does not include a complaint that a physician has been negligent in diagnosing or treating a medical condition. See Estelle, 429 U.S. at 106. Disagreement with medical treatment also does not state a claim for Eighth Amendment indifference to medical needs. Norton v. Dimazana, 122 F.3d 286, 291 (5th Cir. 1997).

A prison official is deliberately indifferent to serious medical needs of prisoners if he intentionally denies or delays access to medical care. Walker v. Butler, 967 F.2d 176, 178 (5th Cir. 1992); Thompkins v. Belt, 828 F.2d 298, 303 (5th Cir. 1987). A prison inmate can demonstrate an Eighth Amendment violation by

showing that a prison official refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs. Easter v. Powell, 467 F.3d 459, 463-464 (5th Cir. 2006), citing Domino v. Tex. Dep't of Criminal Justice, 239 F.3d 752, 756 (5th Cir. 2001). Also, Chapman v. Johnson, 339 Fed.Appx. 446, 448 (5th Cir. 2009)(fact that defendant was aware that inmate had a serious injury and was instructed to provide pain relief medication, but did not do so, could demonstrate an Eighth Amendment violation).

Dr. Kuplesky

Defendants argue in their motion that Veal's claims must fail because he has not been denied medical care at WCC. In support of their motion, Defendants submitted an affidavit from Daniel Marr, the medical director at WCC since about September 2012 (Doc. 57). Marr states in his affidavit that Veal has been diagnosed with hepatitis B, hepatitis C, schizophrenia, and insulin dependant diabetes, and he summarizes Veal's medical records dealing with his foot care (Doc. 57).

Veal contends that he saw Dr. Kuplesky from 2011 through mid-2013, that Dr. Kuplesky sent him to LSU Health Sciences Center to have his feet treated once in 2012 and once in 2013, and that nothing was ever done except shaving the calluses (Doc. 20). Veal alleges he needed to see a podiatrist for treatment of his bunions

16

and ingrown toenails, that Defendants were ordered to provide him medical care for his infected ingrown toenails in 2011, and surgery to remove the ingrown toenails was recommended in 2011, but he was never given that surgery and he continues to have pain and infections in his toes.  Veal states that Dr. Kuplesky remarked that Veal takes a lot of pain medicine that costs CCA a lot of money, and discontinued Veal's Motrin (Doc. 20).

Veal has received continuous medical treatment since 2010, both at WCC and at outside providers.  Veal complains chiefly that he has not been sent to specialists and has not had his ingrown toenails surgically removed.  However, Veal is taken regularly to the diabetic clinic at the LSU Health Sciences Center, which evaluates and treats his feet.  Contrary to Veal's argument that Defendants denied him the surgery that was prescribed for both of his feet by the doctor at the Huey P. Long Hospital, the podiatrist at the Huey P. Long Hospital only discussed *possible* surgery to remove the *bunions* on his *left* foot; he did not recommend surgery for both feet or surgical removal of Veal's ingrown toenails (Doc. 1, Ex. pp. 8, 11/50; Doc. 9, Ex. p. 29/37; Doc. 20, Ex. p. 5/18; Doc. 34, pp. 17/26; Doc. 37, Ex. p. 43/88; Doc. 38, Ex. p. 6/19). The LSU Health Sciences Center personnel clip Veal's toenails in order to remedy and prevent ingrown toenails from occurring.[3]

-------

[3] See MEDLINEplus Health Information, Medical Encyclopedia: "Ingrown toenail," *available at* https://www.nlm.nih.gov/ medlineplus/ency/article/001237.htm (a service of the U.S.

Veal is not entitled to choose his doctors, nor is he entitled to be treated by specialists or to have surgery when there are alternative treatments that may be given.

Veal further alleges that Dr. Kuplesky never sent him to have his knee pain evaluated and treated, but told Veal that he will always have pain in his knees and feet because he is old and has diabetes, and that he could not send Veal to an orthopedist or a podiatrist due to the budgetary constraints imposed by CCA, so the medical director would not approve it (Doc. 20). However, Veal's right knee was evaluated and x-rayed in 2010, and he was found to have degenerative changes but no abnormalities (Doc. 1, p. 7/50; Doc. 9, Ex. p. 33/37). Later, in January 2015, an MRI of Veal's knee showed degeneration with joint effusion and he was diagnosed with osteoarthritis of the right knee with an associated degenerative meniscal tear (Doc. 57, Ex. p. 13/19). Therefore, Dr. Kuplesky did not deny Veal medical care for his knee.

Veal states that Dr. Kuplesky noted that Veal takes a lot of pain medicine that costs CCA a lot of money, and discontinued Veal's Motrin (Doc. 20). However, Veal admits that he is receiving other medication. Disagreement about the medication prescribed does not constitute deliberate indifference to serious medical needs and does not state a § 1983 claim for denial of medical care.

---

National Library of Medicine and the National Institutes of Health).

Veal has not shown that Dr. Kuplesky denied him adequate medical care or was deliberately indifferent to serious medical needs.  Since there are no genuine issues of material fact as to Veal's claims against Dr. Kuplesky, Defendants' motion for summary judgment should be granted as to Dr. Kuplesky and Veal's action against Dr. Kuplesky should be dismissed.

Warden Nicole Walker

Veal contends he complained to Warden Walker about not receiving medical care and she told Veal that she would talk to the medical department about it, but she later told him that the LSU Health Sciences Center does not have a podiatrist (Doc. 20).  Veal contends that Warden Nicole does not know anything about medicine, should not be supervising the WCC medical department, and has failed to do anything about Veal's lack of medical care.

Warden Walker is not a medical professional.  Warden Walker made inquiries into Veal's medical care on his behalf and found he was receiving medical care.  Veal has not alleged that Warden Walker denied or delayed his access to medical care, and has not shown that Warden Walker was deliberately indifferent to his serious medical needs.

Since there are no genuine issues of material fact as to Veal's claims against Warden Walker, Defendants' motion for summary judgment should be granted as to Warden Walker and Veal's action against Warden Walker should be dismissed.

Nurse Amy Brunson

Veal contends that Nurse Amy Brunson cut his toenails and calluses improperly by cutting too deeply, causing Veal further pain and numbness in his feet (Doc. 20).

Veal's allegations of inept medical care by Nurse Brunson amount to medical negligence or malpractice and do not state a claim for deliberate indifference to Veal's serious medical needs under § 1983.

Since there are no genuine issues of material fact as to Veal's claims against Nurse Amy Brunson, Defendants' motion for summary judgment should be granted as to Nurse Amy Brunson and Veal's action against Nurse Amy Brunson should be dismissed.

Nurse Barbara Spence

Veal contends that Dr. Kuplesky is no longer employed at WCC and was replaced by Dr. Singleton, whom Veal saw in July 2013 (Doc. 15). Veal alleges that Dr. Singleton wanted to send him to a podiatrist and an orthopedist, but Nurse Barbara Spence told him that Veal could only be sent to LSU Health Sciences Center and that Veal would always have pain due to his age and diabetes (Doc. 15). Veal contends that Nurse Spence prevented Dr. Singleton from sending Veal out for appropriate medical care (Doc. 15).

Again, Veal's claims amount to being denied his choice of physicians and clinics. Veal has not alleged or shown that he was denied adequate medical care for his serious medical needs or that

Defendants have been deliberately indifferent to his serious medical needs.  Moreover, Veal has not shown that Nurse Spence had the authority to decide what outside physicians and clinics Veal was sent to, and has contended that Medical Director Marr was in charge of the WCC medical department operations.

Since there are no genuine issues of material fact as to Veal's claims against Nurse Barbara Spence, Defendants' motion for summary judgment should be granted as to Nurse Barbara Spence and Veal's action against Nurse Barbara Spence should be dismissed.

Medical Director Daniel Marr

Veal contends that Medical Director Marr is in charge of the operations of the WCC medical department, and that Director Marr discontinued all of Veal's treatments, denied him surgery for his feet, denied him treatment by a podiatrist at Huey P. Long Hospital, and denied him treatment for his knee pain (Doc. 20).

Veal has not shown that surgery was ever recommended for his ingrown toenails, nor has he shown that his bunions were not treated and that surgery was the only possible treatment for his bunions.[4]  Veal's bunions were treated with a change in shoes and orthotics insoles.  Therefore, Director Marr did not deny Veal adequate medical care for his bunions.

---

[4] See MEDLINEplus Health Information, Medical Encyclopedia: "Bunions", available at https://www.nlm.nih.gov/medlineplus/ency/article/001231.htm (a service of the U.S. National Library of Medicine and the National Institutes of Health).

Veal also contends he has been denied treatment by Marr for his knee pain (that is caused by degenerative changes).  However, Veal has been prescribed Tylenol.  In fact, Veal has consistently received more than a dozen different medications for his diabetes, hypertension, and osteoarthritis (See Doc. 37, Ex. p. 1/88 (2012); Doc. 37, Ex. pp. 7, 44, 58, 67/88 (2013); Doc. 37, Ex. p. 71/88 (2014); Doc. 57, Ex. p. 8/19 (2015)).  Apparently some medications were discontinued or the dosage was changed at different times (Doc. 37, Ex. p. 63/88), but the medical records show that his medications were never all discontinued at once, as Veal contends.

As discussed above, Veal's knee pain is due to degenerative causes, and Veal is not entitled to see a podiatrist instead of a surgeon or diabetic care doctor.  Veal's claims amount to a disagreement with his treatment and do not state a claim under § 1983 that Defendants have been deliberately indifferent to his serious medical needs.

Since there are no genuine issues of material fact as to Veal's claims against Director Marr, Defendants' motion for summary judgment should be granted as to Director Marr and Veal's action against Director Marr should be dismissed.

Correctional Corporation of America

Veal names Corrections Corporation of America ("CCA") as a defendant in this case, apparently as the operator of WCC and the employer of the other named Defendants.

A corporation may not be sued under § 1983 for an injury inflicted solely by its employees.   Respondeat superior or vicarious liability will not attach under § 1983.  Monell v. Dept. of Soc. Serv., 436 U.S. 658, 694, 98 S.Ct. 2018, 2037 (1978); Thompkins v. Belt, 828 F.2d 298, 303 (5th Cir. 1987).  The proper test is whether there is a policy, custom, or action by those who represent official policy that inflicts injury actionable under § 1983.  Monell v. Dept. of Soc. Serv., 436 U.S. 658, 694, 98 S.Ct. 2018, 2037 (1978); Sanders v. Sears, Roebuck & Co., 984 F.2d 972, 975-76 (8th Cir. 1993).

Veal has not alleged or shown that a policy or custom of CCA caused a deprivation of his constitutional right to medical care, and has not shown that his constitutional right to adequate medical care was violated.  Since there are no genuine issues of material fact which would preclude a summary judgment, Defendants' motion for summary judgment should be granted in favor of CCA.

### Conclusion

Based on the foregoing discussion, IT IS RECOMMENDED that Veal's complaint against Nurse Gaskill, Nurse Mary, and Nurse Warren be DISMISSED WITHOUT PREJUDICE pursuant to Fed.R.Civ.P. rule 4(m).

IT IS FURTHER RECOMMENDED that Defendants' motion for summary judgment be GRANTED and that Veal's action against Amy Brunson, Daniel Marr, Stephen Kuplesky, Nicole Walker, Barbara Spence and

23

Corrections Corporation of America be DISMISSED WITH PREJUDICE.

Under the provisions of 28 U.S.C. § 636(b)(1)(c) and Fed.R.Civ.P. 72(b), the parties have **fourteen (14) days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court.  A party may respond to another party's objections within **fourteen (14) days** after being served with a copy thereof.  No other briefs (such as supplemental objections, reply briefs etc.) may be filed.  Providing a courtesy copy of the objection to the magistrate judge is neither required nor encouraged.  Timely objections will be considered by the district judge before making a  final ruling.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN FOURTEEN (14) CALENDAR DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

THUS DONE AND SIGNED at Alexandria, Louisiana, on this 30th day of December 2015.

HON. JOSEPH H. L. PEREZ-MONTES
UNITED STATES MAGISTRATE JUDGE